UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEGGY SMITHART,<br>    Plaintiff,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney<br>General of the United States,<br>U.S. DEPARTMENT OF JUSTICE,<br>    Defendant. | Docket No. 1:22-CV-10777 |

**COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1. The Federal Bureau of Prisons ("BOP") discriminated against Plaintiff Peggy Smithart – an experienced nurse who excelled in her position as a nurse supervisor at the BOP's FMC Devens facility – based on her sex, age, and sexual orientation when it denied her a promotion to a supervisory position for which she was amply qualified. The BOP instead promoted a male candidate nearly two decades her junior who had little experience and was not qualified for the position. Ms. Smithart now seeks redress for the BOP's unlawful conduct pursuant to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

2. By all accounts, Ms. Smithart, a Clinical Nurse Supervisor at FMC Devens, was the most qualified candidate for promotion to the open Assistant Director of Nursing position. At the time she applied for that role, Ms. Smithart had 24 years of nursing experience, including 12 years at FMC Devens and nearly a decade in a management role there. Her consistently stellar performance evaluations and commendations describe a dedicated and

1

skilled leader, and her supervisor, the Director of Nursing at FMC Devens, recommended Ms. Smithart for the Assistant Director of Nursing opening.

3. Instead, based on the input of three younger male associate wardens who have a history of sexist treatment of Ms. Smithart and other female nursing staff, Ms. Smithart was passed over for that promotion in favor of Seth Einhorn, a staff nurse at FMC Devens with only nine total years of nursing experience and no experience in nursing management or leadership.

4. Mr. Einhorn initially declined the promotion when it was offered to him by the Warden, explaining that he was not qualified for the role and that he had only applied for it to later demonstrate interest in management. Nonetheless, after significant pressure from FMC Devens leadership, Mr. Einhorn accepted the promotion.

5. At the time, Ms. Smithart was 50 years old and the only openly gay female employee in the nursing department at FMC Devens, while Mr. Einhorn was a 33-year-old heterosexual male. No contemporaneous explanation for Mr. Einhorn's selection was offered, though later explanations include vague and unexplained claims about Mr. Einhorn's better "leadership" skills, additional qualifications in which Ms. Smithart was, in fact, demonstrably superior to Mr. Einhorn; and his level of education, even though the job posting expressly stated that education would not substitute for the required management experience.

6. In light of the objective evidence of Ms. Smithart's extensive leadership skills, the BOP's unsupported claim that Mr. Einhorn had better "leadership" potential is based on sexist gender-based stereotypes that have no place in the workplace.

7. Furthermore, the BOP made this promotion decision about a supervisory nursing role at one of its main medical facilities during the global COVID-19 pandemic, which impacted individuals held at corrections facilities, including FMC Devens. Instead of promoting the most skilled and qualified candidate for nursing leadership positions, the BOP made a promotion decision based on discriminatory animus, potentially risking patient safety.

8. As a result of the BOP's unlawful and discriminatory decision to deny her this promotional opportunity, Ms. Smithart has suffered substantial damages, including loss of income and benefits, loss of career advancement, reputational harm, and significant emotional distress.

## JURISDICTION AND VENUE

9. This action arises out of violations of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e–16, and the Age Discrimination in Employment Act of 1967, 29 U.S.C § 633a. This court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

10. Ms. Smithart filed a related complaint of discrimination before the Equal Employment Opportunity Commission (EEOC) on November 30, 2020. On February 23, 2022, after more than 180 days had passed since the filing of her complaint but no final decision had been issued, Ms. Smithart withdrew her hearing request at the EEOC and filed a notice of intent to file suit. That same day, the EEOC issued its order of dismissal and remand to agency for federal suit monitoring.

11. The conduct giving rise to these claims occurred at Federal Medical Center Devens ("FMC Devens"), a Bureau of Prisons facility located in Worcester County, Massachusetts. Accordingly, venue is proper in this Court.

## PARTIES

12. Plaintiff Peggy Smithart is currently employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP") at FMC Devens as a Quality Improvement and Infection Control Nurse. She is a resident of Pepperell, Massachusetts.

13. Defendant Merrick B. Garland is the Attorney General of the United States. He is named in his capacity as head of the Department of Justice, Bureau of Prisons.

## FACTS

### Plaintiff's History and Qualifications

14. Ms. Smithart is a Registered Nurse (RN) and is currently employed as a Quality Improvement and Infection Control Nurse at FMC Devens (GS series 0610, Grade 11, Step 10).

15. Ms. Smithart has worked as a nurse at FMC Devens since May 2008, when she was hired as a staff line nurse (GS 10). She worked in that role for three years before being promoted into a management role, first as a Clinical Nurse Supervisor and then she moved to the lateral position of Quality Improvement and Infection Control Nurse (GS 11).

16. Prior to her employment at FMC Devens, from 1996 through 2008, Ms. Smithart worked for ten years as a nurse on a medical-surgical unit and in emergency departments.

17. In 1996, Ms. Smithart earned a Bachelor of Science in Nursing from Troy State University, and in 1992, she earned a Bachelor of Science in Health Information Technology from the University of Alabama-Birmingham.

18. Ms. Smithart holds many additional certifications and qualifications, including Basic Life Support, Cardiac Life Support, and Pediatric Advanced Life Support. While at FMC

Devens, she has participated in many continuing education programs, including Patient Crisis, Cardiac Diagnostic and Intervention, Rapid Response Team, Non-Violent Crisis Intervention, Certified Dementia Instructor, and Train the Trainer Instruction.

19. Throughout her employment at FMC Devens, Ms. Smithart has excelled in and dedicated herself to FMC Devens and its inmate population.

20. Before her promotion to Clinical Nurse Supervisor, Ms. Smithart often went above and beyond her duties as a staff nurse. In that role, she assumed the duty of Charge Nurse in the outpatient clinic, long term care unit, and mental health unit.

21. In her role as Clinical Nurse Supervisor, Ms. Smithart was responsible for day-to-day management of patient care teams on the day shift.

22. Ms. Smithart is a leader among the medical staff at FMC Devens, where she is an active member of the Strategic Planning Committee and frequently volunteers to assist with the orientation, training, and mentoring of new staff.

23. When necessary for staffing, Ms. Smithart is often selected to serve as the acting Assistant Director of Nursing and the Institutional Duty Officer at FMC Devens. When acting in those roles, Ms. Smithart is highly successful and meets or exceeds all performance expectations.

24. Ms. Smithart has never received a negative performance review or been subjected to any discipline at FMC Devens.

25. Ms. Smithart has received consistent positive performance reviews and dozens of commendations at FMC Devens, including step increases, time off awards, performance-based cash awards, retention incentives, individual incentive awards for special acts, a

rookie of the quarter award, a supervisor of the quarter of award, and a recent nomination for Supervisor of the Year.

26. Ms. Smithart's 2016-17 performance evaluation praised her strong leadership skills:

   a. "Ms. Smithart not only discusses strengths and weaknesses when discussing Performance Reviews [with the employees under her supervision], but throughout the year she lets nurses know when they are doing a good job as well as teaching instead of getting upset when something is not done right."

   b. "Ms. Smithart does an exceptional job responding to staff conflicts. She is very respectful to both sides, and utilizes professional and objective communication skills to resolve the issue."

   c. "Ms. Smithart has attended Leadership building seminars in preparation for advancement in her career."

   d. "Ms. Smithart effectively uses other leaders around her in developing her own leadership style/skills. She asks appropriate questions, and is able to accept criticism as a building block."

   e. "Ms. Smithart ensures not only that deficiencies have been corrected, but that they do not fall off the radar to become deficiencies again. She also plays a pivotal role in preparing for our upcoming joint commission survey."

27. Ms. Smithart's 2017-18 performance evaluation reiterated the strength of her leadership:

   a. "Inmates often seek out Ms. Smithart's guidance regarding inmate companions and how to handle difficult situations."

   b. "Ms. Smithart has excellent communication skills and remains firm, fair and consistent with all staff."

    c. "Ms. Smithart provides ideas to nursing management on recruitment/retention. She has suggested ways to reorganize the nursing schedule to relieve some of the stress on nurses due to short staffing."

    d. "Ms. Smithart also discusses strengths and weaknesses with staff in an effort to ready them for a position of higher responsibility."

28. Ms. Smithart's 2018-2019 performance evaluation also praised her leadership:

    a. "[Ms. Smithart] supports and encourages the nursing staff to participate in EEO/Affirmative Action activities."

    b. "Ms. Smithart meets monthly with staff under her supervision. She not only provides information to them, but also accepts new ideas or concerns the staff may have."

    c. "Ms. Smithart responds immediately to any and all allegations of discrimination, disagreements, and other conflict. Staff have recently been provided the opportunity to participate in ADR."

    d. "Ms. Smithart is professional in all communications with staff and inmates. She tries to improve morale by providing positive feedback and awards when possible. She works along with the nurses during times when staffing is low."

29. Ms. Smithart's 2019-20 performance evaluation again praised her leadership:

    a. "Ms. Smithart is very supportive of the inmate companion and CNA programs. She provides supervision and education to the inmates in these programs as well as providing back up to the Program Supervisor when she is out."

    b. "Ms. Smithart frequently meets with staff in her area to discuss concerns, suggestions, and distribute new policies/procedures."

    c. "Ms. Smithart conducts morning 'huddles' with her staff to discuss all inmates in her area as well as any staff concerns/issues."

    d. "Ms. Smithart is very good about addressing conflict immediately. She sits with all parties involved, discusses the issues and attempts to resolve it at her level. If that fails, she does not hesitate to recommend ADR."

    e. "Ms. Smithart is actively involved in discussions with the Nursing Management team regarding the need for and placement of nurses throughout the institution. She participates in interviews for new hires and also assists with the orientation of new nurses."

30. Ms. Smithart is currently at Grade 11, Step 10, meaning that she has already received all possible step increases at Grade 11, and therefore has maxed out her earnings capacity.

Assistant Director of Nursing Opening

31. On June 9, 2020, the BOP posted on USAJOBS.gov vacancy number NER-2020-0280, for the Assistant Director of Nursing (ADON) position (GS 12) at FMC Devens ("the ADON posting").

32. The ADON posting listed several requirements for the open position.

33. With regard to education qualifications, the ADON posting required a "graduate or higher level degree, bachelor's degree, associate degree, or diploma from an accredited professional nursing educational program."

34. With regard to experience qualifications, the ADON posting required "At least one or more full years of professional nursing experience that is equivalent to the next lower grade level," examples of which include:

    a. "Experience ensuring nursing standards of patient care and standards of nursing practices are developed and consistent with professional standards."

    b. "Experience participating in the development of patient care programs, policies, and procedures that depict how patients' nursing care needs are assessed, evaluated, and met."

    c. "Experience ensuring compliance with regulatory and accreditation agency requirements."

    d. "Experience supervising and reviewing a nursing plan and scope of care based on a systematic plan of care delivery."

35. The ADON posting specified that "no substitution of education for specialized experience" would be allowed for the ADON position.

36. The ADON posting also specified that any resume submitted in application for the ADON position "must contain all information listed in the Qualifications Section."

37. Jamal Jamison, who was then Acting BOP Northeast Regional Director, was the selecting official for the ADON position.

38. FMC Devens Warden Amy Boncher was responsible for recommending to Mr. Jamison who should be promoted to the ADON position.

39. Warden Boncher joined FMC Devens from another BOP facility in July 2020, during the hiring process for the ADON position.

40. Warden Boncher did not interview Ms. Smithart as part of the ADON hiring process, even though Ms. Smithart understood from her supervisor that Warden Boncher would interview the candidates. Warden Boncher and Ms. Smithart had spoken only briefly on one occasion prior to Warden Boncher's decision.

41. On information and belief, Warden Boncher relied upon input from Associate Wardens Michael Underwood, Hossam Georgy, and Kimo Elraheb to make the ADON selection in August 2020.

42. At the time of the ADON posting, Mr. Underwood was the associate warden in charge of medical, including nursing.

43. The male associate wardens have treated Ms. Smithart and other female nursing staff differently than their male peers, including by ignoring them in staff meetings, dressing them down for voicing their opinions on matters within their purview, and drastically changing their schedules without consulting with them.

<u>Discriminatory Promotion Decision</u>

44. Only two candidates for the open ADON position were referred for consideration: Ms. Smithart and staff nurse Seth Einhorn, a 33-years-old staff nurse and heterosexual man.

45. At the time of the job opening, Ms. Smithart was 50 years old and a Clinical Nursing Supervisor. She is an openly gay woman.

46. Ms. Smithart met the educational requirements of the ADON posting, and she far exceeded the other requirements, including the required year of experience equivalent to the next lower grade level. In fact, Ms. Smithart had many years of experience with each of the four posted examples of required leadership experience.

47. Ms. Smithart's supervisor, Director of Nursing Kristyn Therrien, recommended to Warden Boncher that Ms. Smithart be promoted to the ADON position and enumerated Ms. Smithart's many skills and qualifications in support of that recommendation.

48. At FMC Devens, the recommendation of a department head, like Ms. Therrien, typically carries significant weight or is a determinative factor in the personnel decisions of employees in that department.

49. Ms. Therrien also repeatedly recommended to Associate Warden Underwood that Ms. Smithart should be appointed to the ADON position, not Mr. Einhorn. During these conversations, Ms. Therrien explained to Associate Warden Underwood that Ms. Smithart was the more qualified candidate, and that Mr. Einhorn's lack of relevant experience was concerning.

50. On information and belief, during that conversation, Mr. Underwood made remarks to Ms. Therrien in favor of Mr. Einhorn, comparing Mr. Einhorn's two master's degrees with Ms. Smithart's bachelor's degree.

51. At the time of the ADON posting, Mr. Einhorn had worked for BOP for nine years as a staff nurse. Mr. Einhorn, a participant in the United States Public Health Service, was originally hired through the PHS Commissioned Officer Student Training and Extern Program (COSTEP). He had no prior nursing experience at the time he was hired.

52. At the time of the ADON posting, Mr. Einhorn had no leadership experience in the nursing field, and he had no experience or less than a year of experience with any of the four posted examples of required nursing experience.

53. Because Mr. Einhorn is employed through the PHS program, he is not categorized according to the General Schedule (GS) levels and steps. The GS equivalent of his clinical staff nurse position would be a GS level 10.

54. Clinical staff nurses at GS level 10 were not eligible to apply for the open ADON position. This limitation reflects the BOP's assessment that the jump from a GS-10 level

staff nurse to a GS-12 level leadership position would be too substantial, and only candidates with GS-11 level experience would be qualified to take on the GS-12 level role.

55. Thus, if Mr. Einhorn had been categorized as a traditional BOP employee at his level of experience and skill, he would not have been eligible to apply for the ADON position.

56. In June 2020, around the time he submitted his application for the ADON position, Mr. Einhorn told Ms. Smithart and Ms. Therrien that he was applying for the ADON position.

57. During that conversation, Mr. Einhorn clarified that he was *not* applying for the ADON position because he was qualified for or expected and intended to receive the promotion. Rather, Mr. Einhorn explained, he was only applying for the ADON opening so that he could later demonstrate interest in management roles in order to meet requirements of the PHS program.

58. On information and belief, on numerous other occasions, Mr. Einhorn told colleagues that he did not feel he was qualified for the ADON position.

59. Nonetheless, on August 25, 2020, Mr. Einhorn was selected for promotion to the ADON position over Ms. Smithart.

60. According to Mr. Einhorn, on that day, Warden Boncher and Associate Warden Underwood came to the mental health unit to speak with him about the ADON position. Near the beginning of the conversation, Associate Warden Underwood excused himself, leaving Warden Boncher and Mr. Einhorn to speak alone.

61. According to Mr. Einhorn, Warden Boncher told Mr. Einhorn that she had selected him for the ADON position. Mr. Einhorn thanked Warden Boncher for the honor but told her that he must decline the ADON position. Mr. Einhorn explained to Warden Boncher that

he was not qualified for the ADON position and that he had only applied in order to demonstrate interest in management for purposes of the PHS program.

62. According to Mr. Einhorn, he told Warden Boncher that Ms. Smithart was the most qualified candidate and should have been selected for the ADON position.

63. According to Mr. Einhorn, Warden Boncher encouraged him to take a day to think about the decision, but Mr. Einhorn declined.

64. On information and belief, around the time that he learned of his appointment to the ADON position, Mr. Einhorn reached out to Lisa Bartlett, Nurse Manager, to seek guidance and reassurance because, he told her, he did not feel qualified for the ADON position.

65. According to Mr. Einhorn, shortly after his conversation with Warden Boncher, Associate Warden Underwood emailed Mr. Einhorn, asking Mr. Einhorn to call him, which Mr. Einhorn did.

66. According to Mr. Einhorn, his conversation with Associate Warden Underwood largely mirrored his conversation with Warden Boncher. Mr. Einhorn again explained that he declined the ADON position because he was not qualified and that he had only applied for the position to demonstrate interest in management for purposes of the PHS program. Mr. Einhorn reiterated that Ms. Smithart deserved the ADON job based on her qualifications and expertise.

67. According to Mr. Einhorn, Associate Warden Underwood told Mr. Einhorn not to worry about Ms. Smithart's career and encouraged Mr. Einhorn to take the ADON position to further his own career.

68. According to Mr. Einhorn, after continuing pressure from Associate Warden Underwood, Mr. Einhorn reluctantly accepted the ADON position.

69. Later, on August 25, Associate Warden Underwood emailed Mr. Einhorn a link to the audiobook version of *It Worked for Me*, a book about leadership skills by former U.S. Secretary of State Colin Powell. The following day, Mr. Einhorn confirmed to Associate Warden Underwood that he had ordered and started listening to the audiobook, and he thanked Associate Warden Underwood "for the recommendation" and "for having me call you yesterday."

70. Later, on August 25, Mr. Einhorn reached out to Ms. Smithart directly, asking her to call him on his personal cell phone.

71. When Ms. Smithart called Mr. Einhorn as requested, he relayed to her the events of that day, including detailed descriptions of his conversations with Warden Boncher and Associate Warden Underwood.

72. Mr. Einhorn also told Ms. Smithart that he was extremely nervous about taking on the ADON role. Ms. Smithart congratulated and supported Mr. Einhorn, but shared her disappointment with the process and with the Warden's selection, given the disparity in their qualifications and experience.

73. After that conversation with Ms. Smithart, Mr. Einhorn contacted Ms. Therrien, with whom he had a very similar conversation. Mr. Einhorn relayed to Ms. Therrien the same details about his conversations with Warden Boncher and Associate Warden Underwood, and he repeated his concerns about his qualifications for the ADON position.

74. The next day, on August 26, 2020, Mr. Einhorn's selection for the ADON position was announced publicly.

75. On August 26, Ms. Therrien again met with Associate Warden Underwood to discuss the ADON position. During that conversation, Ms. Therrien reiterated that Mr. Einhorn was not qualified for the position and explained that she would have to basically train him from scratch, given his lack of management experience. She also explained again that Mr. Einhorn lacked the necessary skills for someone in the ADON role.

76. During that conversation, Ms. Therrien asked Mr. Underwood to explain why Mr. Einhorn had been selected for the ADON position. Mr. Underwood declined to explain the reasoning behind Mr. Einhorn's selection.

77. Since Mr. Einhorn's selection as ADON, many of Ms. Smithart's and Mr. Einhorn's colleagues at FMC Devens have expressed their disapproval of Mr. Einhorn's selection and their opinion that Ms. Smithart should have been selected for the ADON position.

78. Warden Boncher has since asserted that she looks for "leadership qualities" when making personnel decisions, and that her recommendation of Mr. Einhorn was motivated by his "leadership roles"; his continued education, including completion of non-mandatory training; the "effort" he put into the resume submitted with his application; and his "attitude of service," as demonstrated by his "participation in mentoring and volunteering activities."

79. In fact, Mr. Einhorn had no nursing leadership or management experience, and FMC Devens leadership thought he needed an audiobook on leadership skills before assuming the responsibilities for the position. In stark contrast, Ms. Smithart has a significant record of participation in non-mandatory training and certifications; Ms. Smithart's resume was required to comply with the unfortunate formatting requirements on USAJOBS, while Mr. Einhorn's was not, due to his participation in PHS; and Ms.

Smithart has a demonstrably more significant history of service to FMC Devens, including through mentoring and volunteering.

80. As a result of Defendant's discriminatory actions, Ms. Smithart experienced substantial damages, including loss of income and benefits, loss of career advancement, reputational harm, and emotional distress.

## COUNT ONE
### Sex, Gender, and Sexual Orientation Discrimination
**42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended)**

81. Plaintiff incorporates and realleges the allegations stated in the previous paragraphs as if fully stated herein.

82. Defendant, through the acts and omissions described above, has unlawfully discriminated against Plaintiff because of her sex, gender, and sexual orientation in violation of 42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended).

83. As a result of Defendant's actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to loss of income and benefits, loss of professional opportunities and career advancement, reputational damage, pain and suffering, and emotional distress.

## COUNT TWO
### Age Discrimination
**29 U.S.C. § 621 *et seq.* (Age Discrimination in Employment Act of 1967, as amended)**

1. Plaintiff incorporates and realleges the allegations stated in the previous paragraphs as if fully stated herein.

2. Defendant, through the acts and omissions described above, has unlawfully discriminated against Plaintiff because of her age in violation of 29 U.S.C. § 621 *et seq.* (Age Discrimination in Employment Act of 1967, as amended).

3. As a result of Defendant's actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to loss of income and benefits, loss of professional opportunities and career advancement, reputational damage, pain and suffering, and emotional distress.

4. Defendant willfully violated Plaintiff's rights under the ADEA and, as a result, is liable for liquidated damages.

WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:

a. That judgment be entered for her and against Defendant;

b. That Plaintiff be compensated for any loss of wages and/or benefits, and damage to reputation and earning capacity, incurred as a result of Defendant's unlawful acts;

c. That Plaintiff be awarded an amount of money that will fairly compensate her for the emotional and physical pain and suffering caused by Defendant's unlawful acts;

d. That Defendant pay Plaintiff's costs and attorneys' fees resulting from this action;

e. That Defendant pay Plaintiff interest on any judgment as provided by law;

f. That Defendant be ordered to pay Plaintiff liquidated, multiple, and/or punitive damages, to the extent such damages are available;

g. That Defendant be ordered to pay such relief as will make Plaintiff whole; and

h. That the Court order such other relief as may be just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

        Respectfully submitted,
        PEGGY SMITHART

        By her attorneys,

        <u>/s/ Monica R. Shah</u>
        MONICA R. SHAH (Mass. Bar. No. 664745)
        CAROLINE DAVIS (Mass. Bar. No. 707088)
        ZALKIND DUNCAN & BERNSTEIN LLP
        65a Atlantic Avenue
        Boston, MA 02110
        (617) 742-6020 (telephone)
        (617) 742-3269 (fax)
        mshah@zalkindlaw.com
        cdavis@zalkindlaw.com

Dated: May 20, 2022